## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES,<br>    *Plaintiff*,<br>v.<br><br>CONTENTS OF ROBINHOOD ACCOUNT<br>ENDING IN 3368, USER ID 233dacb2-481d-<br>4518-8228-9ce00d0ce42a,<br>    *Defendant*.<br><br>[CLAIMANT:  HAMED GHORBANI-<br>MOGHADDAM] | No. |

## VERIFIED COMPLAINT OF FORFEITURE

1.      This is a civil *in rem* action brought to enforce the provisions of 18 U.S.C. § 1347 (health care fraud), 18 U.S.C. § 1035 (false statements relating to health care matters), 42 U.S.C. § 1320a-7b (offering/paying/receiving healthcare kickbacks), and 18 U.S.C. § 371 (conspiracy to receive and pay healthcare kickbacks), for which forfeiture is provided under 18 U.S.C. § 24(a)(1) (defining "federal health care offense" to in include the above offenses); 18 U.S.C. § 1956(c)(7)(F) (defining "specified unlawful activity" to include "federal health care offense[s]"); and  18 U.S.C. §§ 981(a)(1)(C) (permitting forfeiture for violations of specified unlawful activities) and 981(b).

2.      This Court has jurisdiction over this matter by virtue of 28 U.S.C. §§ 1345 & 1355.  Venue is appropriate in the District of Connecticut by virtue of 28 U.S.C. § 1395(b).

3.      The Defendant is the Contents of Robinhood Account Ending In 3368, User ID 233dacb2-481d-4518-8228-9ce00d0ce42a ("Defendant Asset").

4.      The Defendant Asset is located within the jurisdiction of this Court.

## BACKGROUND OF INVESTIGATION

5.      The Connecticut Department of Social Services ("DSS") provides medical assistance to low-income persons and people who could otherwise support themselves if not for the fact that they have excessive health care costs. DSS provides this assistance through the Connecticut Medical Assistance Program (CTMAP). CTMAP offers a comprehensive health care benefit package that includes the following:

        a.      HUSKY A - Family Medicaid;

        b.      HUSKY B - State Children's Health Insurance Program ("SCHIP");

        c.      HUSKY C - previously referred to as Medicaid, Title XIX, fee-for-service, or Adult Medicaid; and

        d.      HUSKY D - previously referred to as Medicaid for Low Income Adults ("MLIA").

6.      The HUSKY programs identified above are joint federal-state government programs designed primarily to finance the provision of the medical services to the indigent. This Complaint refers to the various HUSKY programs above collectively as "Medicaid." DSS administers these Medicaid programs in Connecticut. The Medicaid program is administered at the federal level by the Centers for Medicare and Medicaid Services ("CMS") and is funded approximately 50 percent by the federal government. The remaining approximately 50 percent is funded by the State of Connecticut.

7.      Medicaid is a public plan or contract that pays claims submitted by participating health care providers for medically necessary benefits, items, and services rendered to Medicaid recipients. As such, Medicaid is a "health care benefit program" under 18 U.S.C. § 24(b).

8.    DSS defines medically necessary services as "those health services required to prevent, identify, diagnose, treat, rehabilitate or ameliorate an individual's medical condition, including mental illness, or its effect, in order to attain or maintain the individual's achievable health and independent functioning."

9.    In order to participate in the Medicaid program, health care providers, including dentists, complete enrollment forms and must provide proof of licensure.  As part of their enrollment, providers certify that they will abide by all applicable federal and state statutes and regulations and will keep accurate and current records regarding the nature, scope, and extent of services furnished to Medicaid recipients.  Providers also acknowledge prohibitions against the following:

a.  false statements, misrepresentation, concealment, failure to disclose, and conversion of benefits;

b.  any giving or seeking of kickbacks, rebates, or similar remuneration;

c.  charging or receiving reimbursement in excess of that provided by the State; and

d.  false statements or misrepresentation in order to qualify as a provider.

10.    Participating providers in the Medicaid program are required to maintain (1) a specific record for all services provided to each client including, but not limited to: name, address, birth date, Medicaid identification number, pertinent diagnostic information, and a current treatment plan; and (2) documentation of services provided, including types of service or modalities, date of service and location of the service.  Providers must maintain these records for at least five years from the date of service.

11.    As a part of a provider's enrollment with DSS, they are given access to a DSS portal to submit claims for payment electronically. In addition to billing, a provider can utilize a search tool to confirm if an individual is eligible for Medicaid services and to see the recipient's prior Medicaid claims

history. A provider can perform this eligibility lookup by entering an individual's name and date of birth. If eligibility is confirmed, the provider will be given the individual's Medicaid identification number, which can then be used for billing purposes. By reviewing the Medicaid claims history, the provider can determine the last date of a specific type of service, which would allow the provider to calculate the date a Medicaid recipient is eligible for more services, i.e., such as cleanings.

12.     When Medicaid sends payments to providers for services, Medicaid also sends a document called a remittance advice/notice to the provider.  The remittance advice/notice details the amount Medicaid paid or denied for each claim.

13.     Unlike many other health benefit plans, Medicaid does not send Explanation of Benefits (EOB) forms to its recipients for claims submitted to Medicaid.   As a result, Medicaid recipients generally do not know if a provider has billed Medicaid for services that the recipient did not in fact receive.

14.     Federal law prohibits knowingly and willfully offering or paying any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind, to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.  *See* 42 U.S.C. § 1320a-7b(b)(2).  Because the definition of Federal health care program in this statute includes any plan or program that provides health benefits which is funded directly, in whole or part, by the United States Government, and or by any state health care program, the Connecticut Medicaid program is a Federal health care program under this statute.

15.     Medicaid recipients, who are covered by the program because they are unable to pay for medical benefits, items, or services themselves, may be particularly vulnerable to kickback schemes that induce them to receive health care services in exchange for money.

### Medicaid's Coverage of Dental Services

16.     The Connecticut Medical Assistance Program (CTMAP) provides coverage for dental services to its HUSKY members. These services are administered through the Connecticut Dental Health Partnership (CTDHP). Dental providers are governed by CTMAP and CTDHP guidelines, which set forth the rules of the Medicaid Dental program. Dental services are defined as diagnostic, preventive, or restorative procedures, performed by a licensed dentist in a private or group practice or in a clinic; a dental hygienist, trained dental assistant or, or other dental professionals employed by the dentist, group practice or clinic, providing such services are performed within the scope of their profession in accordance with State law. Pursuant to Chapter 7 of the CTMAP Dental Services Manual, Medicaid pays providers who meet all the applicable state licensing and certification requirements and meet enrollment requirements who provide dental services deemed by the Department to be medically necessary.

17.     The CTDHP Provider Manual, Chapter 5 sets forth the rules governing Marketing Guidelines, to include the compensation of marketing staff and recruitment or solicitation of new patients. Providers must not compensate marketing representatives "through the use of a per client/patient incentive" reimbursement. Additionally, the Provider may not provide or sponsor incentives to the clients exceeding "four dollars per occasion" including cash, gifts or gift certificate or cards to the client or potential patient. Further CTDHP requires all marketing materials be submitted for DSS review and approval, including a "description of the proposed marketing approaches and marketing procedures."

18.     The Medicaid program imposes a $1,000 annual cap on dental services for adults aged 21 and older, according to a Frequently Asked Questions document produced by the CTDHP: "Per the notification provided to Dental providers enrolled in the Connecticut Medical Assistance Program (CTMAP) via Provider Bulletin 2017-81, an annual dental benefit maximum of $1,000 has been implemented for dental services provided to adult clients ages 21 and older enrolled in HUSKY A, C and

D benefit plans for dates of service January 1, 2018 and forward. The dental benefit limit will reset on

January 1st of each year."

### Medicaid's Coverage of Transportation Services

19.     Pursuant to Chapter 7 of the CTMAP Transportation manual, Medicaid assures that

necessary transportation is available for recipients to and from providers of medical services covered by

Medicaid, and, subject to this regulation, may pay for such transportation. Medicaid coverage of

transportation services is, however, subject to applicable regulations.  To participate in the Medicaid

program and receive payment directly from the Department, all commercial transportation providers must

be regulated carriers, enroll directly as providers in the Medicaid program, and meet DSS requirements.

Lawful transportation providers are then eligible to receive payment for their services directly from

Medicaid.

### Method of Billing Medicaid: CDT Codes

20.     In order to bill health care benefit programs such as Medicaid, Medicare, or private health

insurance programs, dental providers use a five-digit number, known as a Current Dental Terminology

("CDT") code, that identifies the nature and complexity of the service provided. The CDT codes are listed

in a manual that is published annually by the American Dental Association.  CDT codes are universally

used by dental providers to bill government and private health insurance programs for services rendered.

Virtually every dental procedure has its own CDT code, and Medicaid and private insurance companies

pay a specified amount of money for each CDT code billed.

21.     Commonly used routine CDT codes (*e.g.,* exams, cleanings, fluoride application) and their

approximate Medicaid reimbursement rates include:

- D0120 - Periodic oral evaluation - established patient ($18.20)
- D0140 - Limited oral evaluation - problem focused ($24.96)
- D0150 - Comprehensive oral evaluation - new or established patient ($33.80)

- D1110 – Prophylaxis ($33.28)
- D1206 - Topical application of fluoride varnish ($15.08)

22.    Commonly used non-routine CDT codes (*e.g.,* fillings and extractions) and their approximate Medicaid reimbursement rates include:

- D2391 - Resin-based composite - one surface  posterior ($49.40)
- D2392 - Resin-based composite - two surfaces  posterior ($59.28)
- D2331 - Resin-two surfaces  anterior ($70.72)
- D2332 - Resin-three surfaces  anterior ($88.40)
- D2394 - Resin-based composite - four or more surfaces  posterior ($104.00)
- D7210 - Extraction  erupted tooth requiring removal of bone ($104.00)

23.    As seen above, routine dental procedures like exams and cleanings are reimbursed by Medicaid at a lower rate than non-routine procedures like fillings and extractions.

### The Fraudulent Scheme

24.    In early 2020, law enforcement learned that a company called ASAPS LLC ("ASAPS") was being paid by certain Connecticut health care providers ("clients") to recruit Medicaid-eligible patients to obtain medical services.

25.    Health care providers were possibly paying ASAPS on either a per patient basis or based on the dollar amount of billable services rendered, in violation of Medicaid rules, and ASAPS was possibly paying the Medicaid patients to go to the health care providers. In addition, law enforcement believed that certain provider(s) were fraudulently billing Medicaid for services not rendered or for unnecessary services.

26.    During the investigation, investigators learned that ASAPS workers recruited patients for their clients through various methods including using social media and by visiting places where ASAPS workers believed they could find Medicaid patients, such as the New Haven Green or homeless shelters.

Investigators also learned, that ASAPS induced patients to use ASAPS client dental providers by paying the patients cash and providing transportation to the provider.

27.     The investigation identified several dental providers using ASAPS for patient recruitment, including Hamed Ghorbani-Moghaddam, DDS ("GHORBANI") the owner of MGM Family Dental LLC ("MGM").

**ASAPS LLC**

28.     According to the State of Connecticut Business Services website, in or around January 2016, ASAPS, LLC ("ASAPS") registered as an LLC in the State of Connecticut. The website listed ASAPS's business address as 218 Hillcrest Road, Bridgeport, Connecticut, and Jeffrey Malave ("MALAVE") as its principal and agent.

29.     ASAPS is not approved by the Connecticut Medical Assistance Program to provide any Medicaid services, including Medicaid Non-Emergency Medical Transportation. At no time did MALAVE enroll as a Medicaid provider, including for transportation services.

30.     From January 2016 through November 2022, ASAPS paid approximately 118 different people to work as marketers, patient recruiters, drivers, or office staff. ASAPS staff include Cheryl Cornell ("CORNELL"), Ada Lawson ("LAWSON"), Raheem Jones ("JONES"), Jonathan Hill ("HILL"), and Mercedes Velasco ("VELASCO").

31.     Based on bank records, from January 2016 through December 2020, ASAPS deposited payments of approximately $2,617,303 from at least 20 different dental and medical providers.

32.     MALAVE separately deposited payments of approximately $377,059 from dental and medical providers. ASAPS operated up until November 2022.

33.     The patient recruitment practices of ASAPS and its arrangements with the various health care providers created the opportunity for ASAPS client dental providers to bill Medicaid for medically

unnecessary services. For example, one client dental provider submitted Medicaid billing claims for a minor child patient whom ASAPS recruited.  Medicaid paid approximately $9,838 in claims for the following services to the child, all purportedly rendered while that child was between the ages of three and nine years old: 54 fillings, 2 extractions, 16 intraoral-periapical radiographic images, as well as patient visits, x-rays, cleanings, and sealants. It should be noted that, based on the child's age, the child had only 20 teeth.

34.     ASAPS uses telephonic and electronic communication with patients and client dental providers to organize the appointments and drivers. ASAPS keeps records of how many patients were transported to each client, if services were rendered by the client, and calculates funds due them for these referral fees. ASAPS often uses email to communicate the amount due from each client dental provider.

35.     Before forming ASAPS, MALAVE held various marketer/patient recruiter positions at dental providers within Connecticut.

36.     For example, prior to its closing in May 2012, MALAVE was a marketer for Trumbull Dental Care. MALAVE was responsible for soliciting patients and handing out flyers advertising the dental practice.

37.     Based on publicly available records, in July 2012, MALAVE and a partner formed New Client Source LLC ("NCS"). NCS provided marketing services, including patient recruitment services to Connecticut dentists.

38.     Because Medicaid recipients receive dental services for free, Medicaid rules do not allow monetary inducements to the recipients.

39.     In or about December 2015, MALAVE and his partner dissolved NCS.  In or around January 2016, MALAVE founded ASAPS as a sole proprietor.

40.     As MALAVE's long-term romantic partner and business partner, Cheryl CORNELL also played a significant role in the operations of ASAPS.

41.     For example, a review of ASAPS representative Raheem JONES's public Facebook page revealed a July 16, 2017, posting of a 7-minute "Facebook Live" video showing JONES on a boat with MALAVE and CORNELL. In this video, JONES refers to CORNELL as "ASAPS First Lady."

42.     CORNELL was working with MALAVE as of April 2015 when she received a check from NCS. From April 10, 2015 through February 2, 2016, CORNELL deposited into her bank account checks from NCS totaling approximately $5,850.

43.     In late 2017, CORNELL began to work as a patient recruiter with health care providers directly (*i.e.*, not through ASAPS). However, sometime in mid-2018, CORNELL started working for ASAPS again, but also continued to work with her own independent clients.

44.     Bank records reflect that, from May 2018 through November 2020, CORNELL deposited approximately $138,370 from health care providers. Bank records reflect that, from February 24, 2016, through December 11, 2020, MALAVE or ASAPS paid CORNELL approximately $88,700.

45.     Beginning January 2016, ASAPS grew rapidly adding marketers, drivers, and administrative personnel and quickly expanding its client base.

46.     ASAPS used various tools to recruit patients, including social media. These social media posts repeatedly advertised the exchange of "cash" in exchange for attendance at dental appointments

47.     For example, investigators identified VELASCO's Facebook profile under the name "Mercedes SweetVictory Velasco." On August 10, 2019, VELASCO posted the following to her public Facebook page on behalf of ASAPS:



48.    On August 21, 2019, VELASCO posted the following on her public Facebook page:



49.    On October 14, 2019, VELASCO posted the following on her public Facebook page:



50.    On January 16, 2020, VELASCO posted the following on her public Facebook page:



51.    On February 29, 2020, VELASCO posted the following on her public Facebook page:



**Mercedes Velasco**
February 29 at 6:21 AM · 🌐

I'll pay $25 to ct husky holders to go to the dentist and $20 to get a physical at an md and I provide free transportation hit me up. This is real🤗😭😭😭😭😭🥺😭🥰🥰

BLOOMBERG.COM
**Checkup for $30, Teeth Cleaning $25: Walmart Gets Into Health Care**

👍 Like          💬 Comment          ↪ Share

52.     On January 18, 2021, VELASCO posted the following on her public Facebook page:

 **Mercedes SweetVictory Velasco**
January 18 · 🌐                                        • • •

I know I have really smart people on my timeline how can I condense this phone text to past clients. I think its too long but informative. Or should I just send the picture.

How you been? this is Mercedes with ASAPS dental marketing. I know you have benefited from this service in the past and was hoping to work with you again. Again I will be paying 🤑💸25. out of pocket for each person that visits one of our affiliated dentist offices in Bridgeport, Norwalk, new haven, Waterbury, etc the one best for you and must get any necessary work done. We will provide free transportation from pick up to drop off.  With only 2 ways to qualify. 1. is if you definitely need something fixed in regards to your teeth. 2.  if patient is a child must not have been to a dentist in the last 6 months and adults must not have been to a dentist in the last 1 year. Does this sound like something you'd like to do again if you qualify? Lmk.
 Happy new year from ASAPS😊

53.    Investigators also identified the Facebook profile for Raheem JONES, another ASAPS marketer/recruiter. As shown below, JONES posted his ASAPS business cards, which include email addresses.

54.    On May 31, 2018, JONES posted the following to his public Facebook page:



55.     On September 27, 2019, JONES posted the following to his public Facebook page:





56.     On June 24, 2020, JONES posted the following to his public Facebook page:



57.     From February 22, 2016 through November 30, 2020, ASAPS and MALAVE paid JONES approximately $219,172.

**MGM and Medicaid Provider Status**

58.     MGM was established or about December 5, 2017, as a dental office owned by GHORBANI and located at 2690 East Main Street, Bridgeport, Connecticut. GHORBANI has been licensed by the State of Connecticut as a dentist since on or about April 16, 2014.

59.     From on or about August 17, 2016 to approximately December 2017, GHORBANI had worked at GHORBANI MOHAMMADI DENTAL PC ("GMD") with Dr. Hamed Mohammadi, located at 2672 East Main Street, Bridgeport, Connecticut.

60.     On or about April 18, 2014, GHORBANI enrolled individually as a dental provider in the Connecticut Medicaid Program and subsequently as a Medicaid billing provider on or about April 21, 2018.

61.     On or about November 14, 2016, GMD enrolled as a billing provider in the Connecticut Medicaid Program.

62.     On or about January 1, 2018, MGM enrolled as a billing provider in the Connecticut Medicaid Program.

63.     As a result of successfully completing these enrollment applications, GHORBANI, GMD, and MGM were each assigned a Medicaid billing provider identification number.

64.     On or about February 13, 2018, GHORBANI electronically signed and submitted the initial Medicaid Provider Enrollment Agreement for MGM, which states that the "Provider acknowledges and understands that the prohibitions set forth in state and federal law include, but are not limited to… any giving or seeking of kickbacks, rebates, or similar remuneration;" GHORBANI electronically signed and submitted similar subsequent Medicaid Provider Re-enrollment Agreements on January 17, 2020 and September 16, 2021.

65.     Prior to the establishment of MGM, GHORBANI managed the operations of the GMD Bridgeport location and provided the majority, if not all, dental services to patients. Beginning in December 2017, GMD patients were transitioned to become MGM patients and GHORBANI was the only dentist who provided services at MGM.

**GHORBANI and MGM's Activities Violate Federal Laws**

66.     GHORBANI and MGM engaged in multiple activities that violate federal law.  These activities includes GHORBANI's payment to ASAPS, and others, of unlawful kickbacks on a per-patient basis, and provision of kickbacks to patients of GHORBANI and MGM via the middleman transportation company, ASAPS, and others.  GHORBANI's unlawful activity also includes billing Medicaid for services that were not rendered and/or were medically unnecessary.

67.     In 2017, GHORBANI entered an arrangement with ASAPS, pursuant to which ASAPS would identify, recruit and transport Medicaid eligible patients to his dental office in exchange for a per patient fee.

68.     From October 2017 through May 2021, GHORBANI paid ASAPS $517,400 by check or bank transfer from bank accounts for which GHORBANI had signatory rights.

69.     On or about October 27, 2017, GMD made its first payment to ASAPS via check for $1,017.26, noting in the memo section "10/13 – 10/17/17." GMD made three additional payments to ASAPS. In total, ASAPS deposited payments from GMD totaling approximately $4,775.

70.     Beginning on or about January 12, 2018, MGM began paying ASAPS by check, which eventually became a weekly occurrence by the end of 2018.

71.     The MGM checks contained various memo notations, including date ranges, the phrase "Appointment services rides transportation," and the word "ASAP." From January 12, 2018 through

September 3, 2019, ASAPS and MALAVE deposited or cashed MGM checks totaling approximately $240,238.

72.     Beginning on September 9, 2019, GHORBANI initiated weekly money transfers from his MGM bank accounts to MALAVE's bank account. No memo notations indicating the purpose of the payments exist for the money transfers. From September 9, 2019 through May 20, 2021, GHORBANI transferred approximately $272,386 to MALAVE.

73.     In total, from October 2017 to May 2021, ASAPS and MALAVE received approximately $517,400 in payments from GMD, MGM and GHORBANI.  Investigation determined that the payment arrangements with GHORBANI continued through November 2022.

74.     Records reflect that, during 2020, MGM and GHORBANI had 5,582 telephone contacts, including voice and text messages, to or from ASAPS or an ASAPS employee. Of these calls, 1,967 were with GHORBANI's cellular telephone XXX XXX-3228.

75.     On February 25, 2021, investigators interviewed Patient 1. According to Patient 1, she used ASAPS to make appointments and provide transportation to appointments for herself and her children. Patient 1 confirmed receiving dental services for herself and children at MGM including cleanings, root canals, extractions and fillings. Patient 1 denied any of the children received more than five fillings at a time and stated that appointments typically lasted about 15 minutes to 30 minutes per child. A review of Medicaid claims billed for Patient 1 and her children detailed that on February 20, 2019, MGM billed for services rendered to seven of the family members, including exams, x-rays, cleanings, and fillings. For five visits from February 2019 through January 2, 2021, MGM billed Medicaid for 16 fillings for one child and 10 fillings for another child.

76.     Law enforcement also learned that GHORBANI frequently emailed ASAPS.  These emails contained, *inter alia*, lists of patients seen by GHORBANI and payments made to ASAPS for individual patients.

77.     Witness interviews and the documentary record (including Medicaid billings, checks, and emails between ASAPS and MGM) confirm the contours of the per-patient payment scheme. Investigators interviewed numerous patients of the MGM dental practice, who verified that ASAPS recruited them to attend dental appointments.

78.     For example, Patient 1 stated that ASAPS calls her when she or her children are due for dental appointments.  ASAPS sets up the appointments and provides transportation.

79.     Based on Medicaid billing records and email records, investigators have determined that Patient 1 and her children were transported by CORNELL to MGM on February 20, 2019.

80.     On that date, ASAPS sent an email to MGM, with subject line "Add on," listing 9 family members of Patient 1 with their respective dates of birth and Medicaid insurance identifications.

81.     On February 25, 2019, ASAPS sent a follow-up email to MGM, with subject line "MGM patients seen and transportation provided for the week of 2/8/19-2/21/19," that included seven names of members of Patient 1's family.  Further investigation confirmed that two of the family members did not receive any services that day.

82.     Additional evidence confirms that MGM paid ASAPS for recruiting Patient 1's family and others. Per a review of MGM's bank account, MGM cut one check for $2,500 to Jeffrey MALAVE on February 26, 2019, with a notation reading "ASAP for period ending 2/21/2019."  MGM cut a second check to MALAVE for $1,500 on February 27, 2019, with a notation reading "toward period ending of 2/21/2019."  MGM cut a third check to MALAVE for $801.50 on February 28, 2019, with a notation reading "Remainder for period ending of 02/21/2019" and "ASAPS LLC" on the subject line.  MALAVE

deposited these checks into his bank account.  Thus, the bank records confirm that MGM paid ASAPS for the recruitment Patient 1's family.

83.     A review of Medicaid claims data verified that MGM billed Medicaid for services to the seven Patient 1 family members on February 20, 2019.  MGM received $4,119 for these services based on the fraudulent kickback arrangement with ASAPS.

84.     Moreover, the records demonstrate that GHORBANI billed for services he did not actually render to the family of Patient 1.  According to Medicaid claims records, GHORBANI billed for the following services per child in Patient 1's family in February 2019:

a)  15 year-old received 3 fillings;

b)  14 year-old received 3 fillings;

c)  11 year-old received 4 fillings;

d)  7 year-old received 3 fillings;

e)  6 year-old received 3 fillings;

f)  4 year-old received 4 fillings.

85.     GHORBANI generally paid ASAPS and MALAVE on a percentage basis, based on the amount Medicaid reimbursed GHORBANI for each patient. GHORBANI paid MALAVE and ASAPS more if a patient required more dental work and therefore, took more time to complete.

**Overview of Kickbacks-Related Claims to Medicaid**

86.     Investigators also obtained records from Appointment Plus, an online appointment scheduling application utilized by ASAPS to keep track of the various dental and medical appointments for clients they recruited.

87.     Within the appointment entries, ASAPS often included client identifiers like name, address, phone numbers, and Medicaid client identification numbers. Investigators were able to take this

Appointment Plus patient data and compare it to Medicaid claims billing data for GHORBANI and MGM. Investigators identified a presumed population of "ASAPS-designated patients" by cross referencing the Appointment Plus data and the Medicaid Claims data. Investigators deemed a patient an ASAPS-designated patient if they appeared both in ASAPS' Appointment Plus data and if they were seen by more than one ASAPS-related provider,

88.     Between August 27, 2015 and September 24, 2021, MGM and GHORBANI's prior practice GMD billed Medicaid for a combined 6,722 patients and 11,068 appointments and were paid approximately $4.03 million for these services. Of the 6,722 patients identified in the Medicaid claims billing data, 4,797 patients were ASAPS-designated patients.

89.     MGM and GMD billed Medicaid for 7,724 appointments for these ASAPS-designated patients and were paid approximately $3 million for these services. Seventy-five percent of the amount Medicaid paid to MGM was paid on behalf of ASAPS-designated patients. Sixty-two percent of the amount Medicaid paid to GMD was paid on behalf of ASAPS-designated patients.

90.     All or almost all patients ASAPS brought to MGM were paid or incentivized by ASAPS to attend the appointments.

91.     GHORBANI opened the Robinhood Account, which is the Defendant Asset, on May 7, 2020.

92.     GHORBANI and/or MGM generally paid MALAVE and/or ASAPS or other patient recruiters 30% of his reimbursement from Medicaid.

93.     GHORBANI and MGM maintained a bank account at Bank of America Account Ending in 2264 (Bank of America 2264). GHORBANI and MGM also maintained a bank account at Bank of America Account Ending in 3405 (Bank of America 3405).

94.    During the period relevant to this affidavit, GHORBANI and/or MGM directed DSS to make all Medicaid reimbursement payments to Bank of America 2264.

95.    Between April of 2018 through March of 2023, Medicaid has paid GHORBANI and/or MGM a total of approximately $5,997,034 to Bank of America 2264.

96.    GHORBANI and/or MGM transferred approximately $1,032,681.02 from Bank of America 2264 to the Defendant Asset.  This was done via a series of transfers that took place from November of 2020 through December of 2021.

97.    GHORBANI and/or MGM transferred approximately $1,937,893.93 from Bank of America 2264 to Bank of America 3405.  This was done via a series of transfers that took place from December of 2021 through the present.

98.    GHORBANI and/or MGM transferred approximately $625,369.43 from Bank of America 3405 to the Defendant Asset.  This was done via a series of transfers that continued through at least November of 2022.

99.    On April 10, 2023, a District Court in the District of Connecticut issued a seizure warrant for the Defendant Asset

100.    The Defendant Asset assets represent the proceeds from violations of federal law.

## **CONCLUSION**

101.    Based on the forgoing, the Contents of Robinhood Account Ending In 3368, User ID 233dacb2-481d-4518-8228-9ce00d0ce42a, seized by the United States, was obtained by violating federal laws, including 18 U.S.C. § 1347 (health care fraud), 18 U.S.C. § 1035 (false statements relating to health care matters), 42 U.S.C. § 1320a-7b (offering/paying/receiving healthcare kickbacks), and 18 U.S.C. § 371 (conspiracy to receive and pay healthcare kickbacks), and therefore subject to forfeiture under 18 U.S.C. § 24(a)(1) (defining "federal health care offense" to in include the above offenses); 18 U.S.C. §

1956(c)(7)(F) (defining "specified unlawful activity" to include "federal health care offense[s]"); and  18

U.S.C. §§ 981(a)(1)(C) (permitting forfeiture for violations of specified unlawful activities) and 981(b).

WHEREFORE, the United States of America prays that a Warrant of Arrest In Rem be issued

for the Contents of Robinhood Account Ending In 3368, User ID 233dacb2-481d-4518-8228-

9ce00d0ce42a; that due notice be given to all parties to appear and show cause why the forfeiture should

not be decreed; that judgment be entered declaring the property to be condemned and forfeited to the

United States of America for disposition according to law; and that the United States of America be

granted such other relief as this Court may deem just and proper, together with the costs and

disbursements of this action.

**<u>Jury Trial Requested</u>**

Respectfully submitted,

VANESSA ROBERTS AVERY
UNITED STATES ATTORNEY

*/s/ David C. Nelson*
DAVID C. NELSON
ASSISTAN U.S. ATTORNEY
157 CHURCH STREET, 25TH FLOOR
NEW HAVEN, CT  06510
(203) 821-3700
FEDERAL BAR # ct25640
David.C.Nelson@usdoj.gov

<u>DECLARATION</u>

I am a Special Agent for the Federal Bureau of Investigation, and the agent assigned the responsibility for this case.

I have reviewed the contents of the foregoing Verified Complaint of Forfeiture and the statements contained therein are true to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 6th day of July, 2023.

<u>/s/ Janet E. Ambrisco</u>
JANET E. AMBRISCO
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION